Larry Lance WADDELL

v.

The STATE of Texas.

No. 09–92–140 CR.

Court of Appeals of Texas,
Beaumont.

March 30, 1994.

Walter P. Fontenot, Liberty, for appellant.

Michael R. Little, Dist. Atty., Steve Greene, Asst. Dist. Atty., Liberty, for State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Judge.

This instant appeal is from a conviction for the felony offense of indecency with a child. The appellant had pleaded not guilty. The trial was to a jury. The jury found appellant guilty. Thereafter, the appellant elected to have the jury assess his punishment. That punishment was assessed at four years confinement in the Institutional Division of the State Department of Criminal Justice and a fine of $10,000.

The appellant briefs and argues two points of error. Point of error number one complains that the trial court erred by admitting

into evidence certain extraneous offenses in the guilt/innocence phase.

The appellant's second point of error avers that the trial court erred by excluding evidence of the appellant which would have shown that the child was fabricating this entire episode, the jealousy against the appellant harbored by the complainant's family and the unusually unsavory habits of the complainant's family.

## Factual Background

The record before the jury demonstrated that the appellant, Larry Lance Waddell, the uncle of the victim, fondled the victim and also had the victim, a male child, fondle the appellant on numerous occasions. These numerous occasions dated back to the time when the victim was about five years old and lasted until the victim became ten years of age. The last such alleged occasion took place in Cleveland, Liberty County, at the home of the victim's paternal grandparents with whom the appellant lived. The victim reported this matter to his mother some time in August of 1990.

On the direct examination of the victim, the young boy testified that the appellant had subjected him to similar sexual misconduct many times over a five year period. To the introduction of this evidence, the appellant objected. Importantly, at an early stage in the guilt/innocence phase and before delivering his formal opening statement, counsel for appellant announced and advised the court of his intention to bring forward witnesses to contend that the victim had totally fabricated the indicted offense at the behest of his parents. This alleged fabrication was done so that the parents of the victim could destroy the appellant's reputation. This desire to destroy the appellant's reputation was based upon sibling rivalry between the appellant and the victim's father. The appellant and the victim's father were brothers. It is clear also that the defense counsel presented this defensive theory to the jury in his opening statement. This fabrication defense was strongly and repeatedly emphasized.

At trial the victim stated that he went to the police because he did not want "it to happen anymore". The trial court sustained appellant's objection to this testimony. Then, the prosecutor asked the child victim, "Had anything like this ever happened—." At this point the appellant's counsel requested a hearing without the jury. In the course of that bench hearing, the appellant objected that the State had failed to establish the "proper predicate" under the landmark *Boutwell* case [1]. The State's rejoinder was that this extraneous conduct on the part of the appellant was proper and admissible under "res gestae". The trial court after a prolonged hearing admitted the evidence. The prolonged hearing presented to the trial judge lengthy arguments and, inter alia, detailed, in-depth summaries of controlling case law. The positions of the parties were made clear and concise to the trial judge.

## Appellant's Point of Error Number One

■ The wording of the appellant's point of error number one is important. It reads:

The trial court erred by admitting into evidence that appellant had committed prior acts of sexual conduct with the same child without first having the prosecutor lay the proper predicate prior to the admission of these extraneous acts. The court also erred in not granting appellant's motion for a mistrial because of the introduction of said extraneous offenses.

The "proper predicate" objection leveled at trial was not adequate. The objection failed to advise the trial court of what was lacking.

During the guilt/innocence phase of the trial, the State proffered only two witnesses, one being Dolly Dill, the police officer and detective who took the statement from the child victim, and the other witness being the complainant (the victim) BBW. The indictment contained two charging paragraphs. The first paragraph alleged that the accused intentionally and knowingly with the intent to arouse and gratify the sexual desire of the said defendant engaged in sexual contact by touching the genitals of BBW, a child younger than 17 years of age, being the victim.

---

1. *Boutwell v. State,* 719 S.W.2d 164 (Tex.Crim. App.1985).

The second paragraph presented that on April 13, 1990, the defendant did intentionally and knowingly with the intent to arouse and gratify the sexual desire of the said defendant engage in sexual contact by causing BBW to touch the genitals of the defendant.

The first witness called by the prosecution was the detective Dolly Dill. This detective testified she became involved in the investigation concerning the appellant on or about August 6, 1990, when the victim, accompanied by his parents as well as other individuals, came to the police department. The detective interviewed the victim. The victim along with other individuals made a statement regarding the alleged sexual abuse committed by appellant.

On cross, the defense counsel specifically asked and questioned the detective concerning when she had talked to the boy and when she had stated that the boy had said something happened in mid-April of 1990. The defense counsel wanted Dill to be more specific as to the date when the incident occurred. The detective replied that the incident occurred shortly after the grandparents of the boy had moved to Cleveland. The boy complainant had come to Cleveland to be with his grandparents. That was as specific as the detective could remember. Then, the defense counsel asked if the boy had told the detective what type of weekend it was and was there any special activity going on when this incident allegedly took place. The detective replied that it was either on Spring Break or something like that but she could not be absolutely certain. The detective testified that the indicated offense may have occurred during the weekend of Easter or on Spring Break or some time like that.

The grandparents' residence was also the residence of the accused, being the uncle of the boy. Importantly, the defense counsel asked:

Q  Did you interpret weekend to mean Friday through Sunday?

A  That is what I assumed it was because it was—I believe—I am not sure.

Q  Okay.  But he didn't pin it down like Friday or Saturday or Sunday?

A  To the best of my recollection, no, sir.

In view of the cross-examination which stressed the time and the date and the special nature of the weekend of the occurrence, the prosecutor on re-direct asked the detective if she could identify a document marked as State's Exhibit No. 1. She said that that was a statement from the boy-victim. She also stated that the document would be a better record of what the boy had actually told the detective, rather than her memory. The detective definitely stated that this exhibit "is what he told me". She identified the document as being a true copy of the statement.

The objections made to State's Exhibit No. 1 were to the effect that the statement was in violation of *Boutwell, supra,* and *Rodriguez* [2] in that the document would bring in extraneous matters that were said to be inadmissible. The prosecution countered that in view of the cross-examination of Detective Dill about what the boy told her that the defense had opened the door to what the boy had actually told Dill. The prosecution took the position that State's Exhibit No. 1 was admissible under Tex.R.Crim.Evid. 106 and 107. Furthermore, it was argued to the court that under the *Boutwell* decision, prior instances of sexual misconduct between an accused and a victim (being the same victim) were admissible to show the context of the relationship—the relationship here being that of uncle to a nephew. The defense counsel objected to State's Exhibit No. 1 as to the part that starts with the paragraph at the bottom of the statement which reads:

> The first time Uncle Larry did this to me I was five years old. It happened in Uncle Larry's bedroom in Houston. Uncle Larry has done this to me many times. Uncle Larry did this to me when he was living in Hardin. It happened in his bedroom. He made me touch his penis just like the other times.

Defense counsel ably summarized his objections as constituting extraneous offenses and that a proper predicate had not been

---

**2.** *Rodriguez v. State,* 781 S.W.2d 443 (Tex.App.—        Fort Worth 1989, pet. ref'd).

satisfied. At this point defense counsel stated that the exhibit would be highly prejudicial to his client and that his client would be forced to defend other allegations for which he had not been indicted. Also, the statement was hearsay.

It is settled that a "predicate" objection (without more) does not preserve error under the current rules of criminal evidence. At this point, the State offered to withdraw the last four lines of the statement, which was the last paragraph. Then, the remaining objection was that the statement (State's Exhibit No. 1) was hearsay. The court sustained the defendant's objection announcing that the court would consider the matter further at a later time. State's Exhibit No. 1 was not entered into evidence and no part of it was entered into evidence. On re-direct the prosecution established that from the detective's recollection the victim's statement did not mention anything about a holiday or a Spring Break or Easter or any other special weekend. The detective answered that the statement merely referred to the middle of April on a Friday afternoon. It was clear that this statement concerned the indicted offense and had no reference to extraneous offenses. The detective witness was excused. Next, the prosecution called the boy complainant to the stand.

▉ The issue as to the admissibility of the extraneous offenses and transactions was hammered out (before the trial judge) on the anvil of *Boutwell v. State,* 719 S.W.2d 164 (Tex.Crim.App.1985). The authority of *Boutwell* was urged upon the trial judge by both sides. Both sides placed major, if not paramount, reliance on *Boutwell.* This issue then was presented to the district judge as an issue to be decided by the trial judge's interpretation of *Boutwell.* In *Boutwell,* the court recognized an exception to the general rule of non-admissibility of extraneous offenses. The exception was characterized as a sort of "res gestae" exceptions for cases involving sexual offenses—especially with young children. The Court of Criminal Appeals reviewed cases previous to *Boutwell* and resolved several lines of conflicting decisions involving the admission of extraneous acts of intercourse between the defendant

and the victim in rape cases of children under the age of consent. We quote from *Boutwell:*

> In a very thorough and extensive opinion examining other jurisdictions as well as Texas, the Court held that prior acts of intercourse *between the defendant and the complainant* were admissible, just as they were in prosecutions for adultery and fornication, to show the circumstances and relationship of the parties so as to place the charged act of intercourse in the context of the long-continuing relationship that existed. The court held:
>
>> that all acts and conduct that can be considered and were intended as an inducement to render the accomplishment of his [defendant's] purpose possible [are] admissible in evidence and where the facts show that a father or person standing in loco parentis, or who, by any tie would cause a child to look to him for guidance, or person who stands in such relation that the child would be susceptible to his wiles, and such person or persons shall, after the acts of inducement, have sexual intercourse with such child at available opportunities, all such acts of intercourse are admissible ... (emphasis theirs)

[*Battles v. State,* 63 Tex.Cr.R. 147] 140 S.W. [783] at 797.

Quoting further from *Boutwell:*

> Even if we view *Battles,* supra, as establishing an exception, in sex cases, to the general rule barring admission of extraneous offenses, it is a very narrow exception permitting the admission of acts which occurred between the minor complainant and the defendant so as to explain the charged act and view such an unnatural act in light of the relationship of the parties as well as to make a child's accusation more plausible. A jury would otherwise hear essentially an incomplete version of the charged offense, as though it had occurred in a vacuum as a one-time act. Such evidence from a child, standing alone, might be considered implausible or incredible. The narrow exception sought to alleviate some of that problem.

The high court further reasoned that these extraneous acts would be admissible, such as the case where the defendant denied such a relationship or where cross-examination was of such character as to make the other acts admissible.

In *Boutwell,* the Court of Criminal Appeals further wrote at 175:

As we noted in *Morgan [v. State],* supra [692 S.W.2d 877], at 880, n. 3 [Tex.Cr.App. 1985]:

The requirement that the material issue be contested as a prerequisite to admission of extraneous acts in proof thereof ... is no more than a rule of thumb for insuring that an extraneous act is genuinely needed to shore up the State's case. It is really, therefore, an aspect of the "more probative than prejudicial" analysis, since, ... the greater the State's need to resort to extraneous offenses to prove up some material issue in the case, the higher will be the probative value of that offense in relation to its potential for prejudice.

Regardless of the sequelae of *Boutwell,* we do not comprehend that the later rulings were intended to eviscerate two basic concepts expressed in numerous cases. These concepts are, one, that there is a natural, strong reluctance on the part of an average juror to believe that a father or even a step-father would sexually violate his daughter or step-daughter. The second concept is that there exists in public opinion a reluctance to believe the testimony of a young child in such a situation. There exists also a respectable consensus that young children tend to fantasize and are highly subject to suggestion, especially if a divorce or custody case is pending. In view of these concepts and opinions, the prosecution, it seems, has an additional and difficult burden of proof in child abuse cases.

These two concepts have not been shown to no longer exist. These are practical, yet philosophical, considerations that have not been overruled by case law. This writer really approves of such language in the other opinion that "the case law cited by the parties in the hearing before the trial court was as outdated as a leisure suit in a karaoke [sic] bar." However, we think the correct spelling is carioca—even so, the concepts set out immediately above, we submit, were and are not outdated. We doubt if Judge Woods knows what a carioca bar is; certainly this writer did not until recently educated.

A careful reading and thoughtful analysis of the boy's testimony demonstrates the admissibility of the extraneous transactions. The charges that took place occurred about two years before the date of trial when the boy was about ten years old. The boy was to stay at the grandparents' home over the weekend with a cousin. His grandparents had picked him up from school and the group journeyed to Cleveland. The defendant uncle was living with the boy's grandparents.

Q  Now, where did this happen that the defendant touched you?

A  In his room.

Q  Was he living there with your grandparents?

A  Yes, he was.

Q  Can you remember what part of the day it was?

A  In the afternoon because we was gonna eat dinner in a little while.

Q  And how—Tell the jury what happened.

A  He made me touch him. (Crying) He made me touch him on his private parts.

Q  Okay, [BBW]. You-all were in his room?

A  Yes.

Q  Was the door open or closed to his room?

A  Closed.

Q  Where were you-all in the room?

A  In his bed.

Q  How did you have occasion to go into his room?

A  He told me to.

Q  Did he call you into his room?

A  No, I was walking right there and he told me to come in there.

Q  Now, did he have his clothes on or his clothes off?

A  Off. He was laying under his blankets in his bed.

Q Did he—Where were you in the room?

A I was walking in and he told me to— just between the door and the bed, he told me to pull down my pants.

[DEFENSE COUNSEL]: Excuse me, Your Honor, I am sorry, but I didn't get that part.

THE COURT: Would you repeat what you just said?

A (By the witness) He told me to come in the room. I was between the door and the bed and he told me to pull down my pants.

Q (By Mr. Greene) [BBW], did he touch you any place?

A Yes.

Q Where did he touch you?

A On my private parts. The same place he made me touch him.

Q What part of his body did he touch you with?

A His hand.

Q What part of his body did he make you touch him with? I mean, when he had you touch his body, what part of your body did he have you use to touch him?

A My hand. But I didn't—didn't want to do it—because he grabbed my hand around my wrist.

Q Did he have you do anything with your hand?

A He made me move my hand up and down.

Q Was that on his private part?

A Yes.

Q [BBW], when you talk about his private part and your private part, are you talking about the upper part of your body, the middle of your body or the bottom of your body?

A The middle.

Q Are you talking about where a man urinates or—

A Yes.

Q Have you ever heard the term penis?

A Yes.

Q When you say private part, are you talking about his penis?

A Yes.

Q Now, when he made you put your hand on his penis, you said he made you move it how?

A Up and down.

Q Did anything come out of his penis?

A Yes.

Q What did it look like?

A It was white.

Q Now, did he touch you first or did he have you touch him first or—

A Him.

Q All right. What happened after he touched you?

A Nothing. He just—He just did. You mean after he made me—he stopped?

Q Yeah.

A I pulled up my pants and I ran out.

Q [BBW], do you know who else was at home when this happened?

A My grandparents and my cousin.

Q Do you know where they were in the house?

A My grandfather and my cousin were watching T.V. and my grandmother was making dinner.

Q Did anyone see what happened?

A No.

. . . .

Q Do you remember how long after you told your mom that you went to see her, Dolly Dill?

A It was about a day or two.

Q [BBW], what made you finally tell your mom?

A I didn't want it to happen any more. I never did, but—I didn't want it to happen—

[DEFENSE COUNSEL]: Objection, Your Honor. He is not being responsive, and he has answered the question that was asked.

THE COURT: Sustained.

We must respectfully disagree with the learned trial judge because the answer given by BBW definitely was responsive as to why he told his mother. He simply did not want anything to happen anymore. He never did want such sexual contacts to occur and he did

not want them to happen in the future. On balance, in light of the accused's opening statements, the trial judge was correct in deciding that the extraneous acts were more probative than prejudicial. *See Brown v. State,* 657 S.W.2d 117 (Tex.Crim.App.1983). *See also Montgomery v. State,* 810 S.W.2d 372, 386 (Tex.Crim.App.1990).

Thus, the trial court did not abuse its discretion. The prosecution had the right to a fair trial and a full day in court—certainly also as did the accused.

The defense took the position that the parents of the complainant were engaged in a nefarious scheme to discredit the reputation of the appellant. If the whole prosecution was a fabrication and a nefarious scheme by the alleged malevolent parents, then why did not the malicious parents persecute the appellant much earlier—say when the complainant was five, six, or seven years old? The evidence would have been fresher and more forceful. The complainant would have been younger. If the parents were malevolent and fabricators, then logic and reason would dictate that the parents would act at the earliest opportunity. Thus the extraneous acts were a logical and necessary rebuttal of the major defensive theory. Also, the prosecution was obliged to present the extraneous matters when it did, because the prosecution could not know what or when or if the defense would present evidence of fabrication or other defenses by way of witnesses and testimony. Certainly, the defense could have rested immediately after the State rested. The State could not reopen.

### The Crucial Prolonged Dialogue at the Bench

■ At a certain prolonged dialogue at the bench, the accused's able counsel argued at length and relied heavily on an article in the Texas Bar Journal. *See* John Narsutis, J., *Boutwell And the Rodriguez Dilemma,* 55 Tex.B.J. 351 (1992). This outstanding article referred to *Montgomery v. State, supra,* and *Duckett v. State,* 797 S.W.2d 906 (Tex.Crim. App.1990), placing the burden of proof on the opponent of the evidence to demonstrate that the negative attributes of the evidence *must substantially outweigh* any probative value.

After this lengthy conference out of the presence of the jury, the trial judge declared an early luncheon recess; and from the record, it is clear that the trial judge read and studied the Bar Journal article. He summarized the same, he followed the same, he properly weighed the evidence and found it admissible—he definitely did not abuse his discretion.

The trial court's decision was in major part also based on the Bar Journal article. We conclude that the trial judge based his ruling upon the citations, positions and arguments of the parties. What else should he do? Therefore, no abuse or error is shown. It seems poor policy indeed to reverse a trial judge on contentions and authorities that were not presented to him.

The credibility of the complainant was challenged through the cross-examination of the State's first witness, Detective Dill. The young boy's reliability as to remembering times and dates was impugned. The young complainant's ability to recall events and facts was challenged.

As we view the record, this challenged evidence was necessary to the jury's understanding and comprehension of the indicted offense in view of the fabrication theory and in view of the defendant's position that the parents of the complainant wanted to destroy the reputation of the appellant. *See and compare Rogers v. State,* 853 S.W.2d 29 (Tex. Crim.App.1993). Since "necessity" is said to not generally serve a "purpose" other than character conformity, a limiting instruction should always be given and the same was given here. It is submitted that the trial judge's actions ought to be reviewed on appeal in relationship to the authorities that were presented to the trial judge and the arguments and positions taken by the parties at trial. In view of the arguments and authorities relied upon by the appellant, the trial judge ruled correctly.

In *Owens v. State,* 827 S.W.2d 911 (Tex. Crim.App.1992), the Court opined that in determining admissibility of evidence of extraneous criminal offenses the term "system" can be used synonymously with terms such as "modus operandi" or "methodology" refer-

ring to an accused's distinctive and idiosyncratic manner or mode of committing certain criminal acts. Thus evidence of an accused's particular "modus operandi" is a well recognized exception to the general rule excluding extraneous offense evidence.

As we appreciate the record, the accused's extraneous offenses were so nearly identical in method, mode, and similarity to the indicted offense as to earmark these extraneous offenses as those of the accused. The prior offenses always happened in the uncle's bedroom with the door closed, with a lock on the door. An unusual and unique feature of this record is that the uncle committed no such offense against any other person except the complainant. We submit that the other offenses were "signature" wrongs; yet over the five-year period the "signature" of an accused can vary. Thus, on this independent ground the trial judge did not abuse his discretion. The trial bench committed no error in admitting the prior offenses between the same persons under this record.

Clearly, the trial judge decided from all counsel's arguments that the challenged evidence that was adduced by the prosecution was not designed to demonstrate bad character or bad trait of character, but was offered to meet and rebut the extremely well-developed (although later) fabrication defense of the appellant. Additionally, the proffered, prior extraneous transactions and offenses did not have such a prejudicial effect and were not of such a prejudicial nature that the same substantially outweighed the probative value of the challenged testimony. The sentence assessed by the jury was light. There was no unfair prejudice because the objected-to evidence was not of such a heinous nature as to incite the jury to make any irrational decision. The jury's verdict clearly shows this. *United States v. Salisbury*, 662 F.2d 738 (11th Cir.1981), *cert. denied*, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982). *See also United States v. McMahon*, 592 F.2d 871, 876 (5th Cir.1979), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979). Nor were the prior offenses irrelevant—they were certainly not so irrelevant as to lack probative force as to the offense charged under this record.

Finally, the objected-to testimony that was ultimately introduced before the jury was not so detailed in its description nor lengthy in its duration that a jury could be even substantially prejudiced or confused. Judge McCormick put it succinctly when he wrote in *Templin v. State*, 711 S.W.2d 30 (Tex. Crim.App.1986):

> The case law in our jurisdiction has also established that prior misconduct evidence may be relevant to and properly admitted to show malice, *the existence of a scheme or plan or to refute a defensive theory*. *Albrecht v. State*, supra. [*Albrecht v. State*, 486 S.W.2d 97 (Tex.Crim.App.1972) ]

> As this Court has stated in the *Williams* case, there is no hard and fast rule concerning when and under what circumstances evidence of prior misconduct will be admitted into evidence. Rather, the circumstances which justify the admission of this form of evidence are as varied as the factual circumstances of each case wherein the question arises. See *Albrecht v. State*, at 100. (emphasis added)

■ However, there is an additional, clear basis of admissibility under the Rules. Under the specific language of Tex.R.Crim.Evid. 404(a)(1), the evidence presented by the defense was in great detail and was lengthy and was adduced from numerous important witnesses, many of whom were close members of the family—one being a sister to the boy victim and the grandparents of the boy victim—among many others. These witnesses for the defense established that the character of the accused was an exemplary one, that he had helped to support the mother and father of the boy victim when the father either would not work or could not work. By volumes of testimony these witnesses sought to establish that the character of the accused was such that he could not have had the necessary intentions or the required lascivious motivations.

Therefore, the State was clearly within the express provision of Rule 404(a)(1) which provided that evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of the accused.* Evidence of a pertinent trait of his character offered by an accused or *by the prosecution to rebut the same.* (emphasis added)

Rule 404(a)(1) stands as an independent and separate ground of admissibility under this record—the prosecution was rebutting the evidence of the defendant as to his sterling character and as to his traits of character that would absolutely prohibit his committing the indicted offense. This quoted Rule has special force because the defense, following Rule 405(b) demonstrated by literally volumes of testimony that the character or the traits of character of the accused were such that he was incapable of possessing an essential element of the indicted offense. And the defense offered and strongly tended to prove the same by many specific examples and instances of the appellant's stellar and laudable character, conduct, and reputation.

█ Likewise, the State had a right to prove the extraneous acts under Rule 406 dealing with the habits of a person. Here, the habit of the accused *vis-à-vis* the victim was relevant. This evidence of habit is admissible whether corroborated or not and regardless of the presence of other eyewitnesses. Hence, the so-called extraneous acts were clearly relevant and admissible under Rule 406. Also, they were clearly admissible under Rule 406 since the accused was acting in conformity with his established habit in relationship to the five-year-old through ten-year-old boy victim.

Judge Clinton in *Montgomery v. State, supra,* wrote the opinion on rehearing on the Court's own motion. In his opinion designated as "II. THE TRIAL COURT'S FUNCTION", he writes that the proponent of the other extrinsic evidence may persuade the trial court that the other crimes, wrongs or acts have relevance apart from character conformity; and that such evidence tends to establish some elemental fact such as intent, or that the said evidence tends to establish some evidentiary fact—motive, opportunity, preparation, plan or knowledge. These evidentiary facts usually lead, at least inferentially, to an elemental fact *or they serve to rebut a definitive theory.* In this record, the other crimes, wrongs or acts served two purposes, the main purpose being rebuttal of the defense of fabrication.

Also, Judge Clinton cited with approval 22 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE §§ 5249, 5250 (1978). Section 5250 lists and discusses the factors that a trial court may consider in exercising its discretion concerning evidence of other crimes. The factors are ten in number. In our opinion the factors of: (1) probative worth, (2) need to prove the issue, (3) sufficiency or insufficiency of other evidence, (4) availability of other proof, (5) strength of the proof of the other crimes, (6) prejudice—the other crimes were not more heinous, therefore, the prejudice is negated, and the doctrine of "comparative enormity" is not involved, (7) time required to prove other crimes, (8) nature of the proof of the other crimes and (9) motivation of the offeror—all these compelling factors support, with irrefutable logic, the trial court's decision to permit this evidence to be admitted. Certainly, these nine of the ten factors are clearly supportive of the trial court's rulings and these factors weigh heavily toward admissibility and relevancy and are overwhelmingly persuasive to show *that the trial court did not abuse its discretion.* In the last *Montgomery* opinion, it is reasoned that the "purposes" designated in Rule 404(b) are "neither mutually exclusive nor collectively exhaustive." Thus, the challenged evidence was admissible, inter alia, to meet the fabrication defense. In the charge the trial court gave a stringent limiting instruction and the limiting instruction was forcefully binding on the jury.

In substance the jury was strictly instructed that it could not consider the other offenses, unless they were committed and the jury found and believed same to have been committed beyond a reasonable doubt and then the jury could only consider the same in determining the circumstances and relationship of the defendant to the victim so as to place the offense in the context of the relationship that existed *and for no other purpose.* In the wording of this mandatory instruction the purpose was so limited and restricted that the jury could not have considered these matters in passing upon the

indicted offense. Thus, there was no error in admitting the other crimes, wrongs or acts. Modern juries follow the trial court's instructions. The trial jury could not have considered the extraneous evidence in passing upon the guilt of the accused as to the indicted offense. Appellant does not contend to the contrary.

In light of the above, we overrule appellant's point of error number one.

### Appellant's Point of Error Number Two

■ The wording of appellant's point of error number two is equally important. It reads:

> The trial court erred by not allowing appellant to present evidence from several witnesses which would have shown that the child was fabricating this entire episode because of the child's fear of his parents and the child's history of lying and getting even with people whom he disliked.

It is important to emphasize at the very beginning of the case during voir dire, that the defense counsel announced that he planned to bring forth evidence that this little boy was fabricating this whole thing and that his parents had put him up to it. The defense counsel stressed in his formal opening statement to the jury that he was going to have witnesses to show the motive as to why the little boy was lying. Defense counsel repeated that he had to show that this little boy was fabricating this entire episode, that he had to show the facts and circumstances of who put the victim up to it, why he was put up to it, and that the bitter animosity between the family members involved three generations. Acrimonious sibling rivalry was to be shown between the defendant and the victim's father. Defense counsel wanted to let the jury know what the defense planned to do and defense counsel did so in a most compelling manner. In fact, the defense counsel pointed out and emphasized that he was entitled to go into why the boy was lying.

The defense trial counsel further announced that concerning the reputation of the defendant, the counsel definitely planned to bring forth people who knew and know the defendant very well. These people had lived with the defendant. These people included his mother, his daddy, his sisters, and people in the neighborhood where the defendant had worked—all knowing the defendant "real well". The closing sentences of the defense's opening statement pleaded with the jury to keep an open mind until the jury had heard all the evidence and then decide whether the boy was telling the truth or creating a fabrication; and the victim was put up to it "by his mama and his daddy".

When the prosecution rested the defense was obliged to meet and negate, if proper, the State's case. Several witnesses offered relevant evidence to disprove, or certainly to discredit, the complainant's testimony as to the extraneous acts that were said to have occurred from the time the boy was five years old until he reached his tenth birthday. The State certainly opened the door to this evidence but the same was not admitted before the jury. It was amply developed in bills of exception.

Under TEX.R.CRIM.EVID. 404, character evidence generally is not admissible but there is an important exception—especially important to this appellant. Rule 404(a)(1) provides that evidence of a *pertinent trait of the accused's character may be offered by an accused.* The excluded evidence was admissible on this additional basis. Also, the excluded evidence in favor of the accused was admissible under Rule 406 as evidence of the accused's good habits and as a rebuttal to the prosecution's case. Under Rule 406 the appellant possessed a right to prove his laudable habits and his routine practices. This evidence, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove the conduct of a person— the appellant here—on a particular occasion. But here, appellant Waddell had many corroborating witnesses and a legion of eyewitnesses.

This defendant was denied his full day in court.

A reversal of the judgment and a remand of the cause is mandated.

A remand is necessary because of error in declining to admit the defendant's evidence tending to strongly and logically disprove the

extraneous acts. The harm is evident. Remand is required by TEX.R.APP.P. 81(b)(2). It is clear that under this record our appellate court cannot determine beyond a reasonable doubt that the error made no contribution to the conviction or the punishment. We must sustain appellant's point of error number two. We reverse the judgment of the trial court and remand the cause for a new trial.

REVERSED AND REMANDED.

BURGESS, Justice, concurring.

I concur in the result. However, I would sustain point of error one. As noted by the majority, the genesis of the point was a bench hearing, which covers 28 pages in the statement of facts. In the course of this hearing, appellant repeatedly objected that the state had failed to establish the proper "predicate" under *Boutwell.* The state repeatedly countered that the extraneous conduct was "res gestae." The trial court ultimately admitted the evidence.

At the outset, I must stress that at no time during the course of this lengthy hearing did anyone mention the Rules of Criminal Evidence. A "predicate" objection does not preserve error under the Rules. *Boutwell v. State,* 719 S.W.2d 164 (Tex.Crim.App.1985), has no legal force independent of TEX. R.CRIM.EVID. 404(b). *Vernon v. State,* 841 S.W.2d 407 (Tex.Crim.App.1992). The principle of "res gestae" in the sense the term is employed here to describe the background of the transaction, likewise was not incorporated into the Rules. *Rogers v. State,* 853 S.W.2d 29 (Tex.Crim.App.1993) (opinion on rehearing). *Vernon* was decided after the trial of this cause, but long before appellant filed his appellate brief. Another case, *Owens v. State,* 827 S.W.2d 911 (Tex.Crim.App. 1992), had been decided before this trial, and might have illuminated the trial court, but apparently neither the state's attorney nor the defense attorney was aware of it. I also note that no one mentioned *Montgomery v. State,* 810 S.W.2d 372 (Tex.Crim.App.1991) (opinion on rehearing). Had the court been cited to this case, it would almost certainly have performed a different analysis and our review would be simpler. As it was, the case

law cited by the parties in the hearing before the trial court was as outdated as a leisure suit in a karaoke bar.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R.CRIM.EVID. 401. "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." TEX.R.CRIM.EVID. 404(b).

An objection that evidence constitutes an "extraneous offense" is ordinarily sufficient to apprise the court of the nature of the complaint under Rule 404(b). *Montgomery,* 810 S.W.2d at 387. Once that complaint is lodged, it is incumbent upon the proponent of the evidence to satisfy the trial court that the extraneous conduct has relevance apart from its tendency to prove character and action in conformity therewith. *Id.* Evidence which is not relevant is absolutely inadmissible. TEX.R.CRIM.EVID. 402.

It must be considered that the proceedings below were improperly presented in the context of *Boutwell.* Appellant clearly objected to the evidence because it was *extraneous,* that is, not within the ambit of the charged offense. Under *Montgomery,* this is a sufficient Rule 404(b) objection. Indeed, appellant assumed his burden was greater than it actually was, because *Boutwell* recognizes an exception to the general admissibility of extraneous conduct which the Rules do not recognize, namely the notorious "res gestae" background contextual evidence. *Rogers,* 853 S.W.2d at 33; *Mayes v. State,* 816 S.W.2d 79 (Tex.Crim.App.1991). Under the Rules, when faced with a Rule 404(b) objection, the proponent of that evidence must then satisfy the trial court that the evidence is relevant to a material issue. I conclude appellant's objection was sufficient to require the trial court to determine whether the evidence was admissible under Rules 401 and 404(b).

In reviewing the trial court's determination of relevancy, an appeals court will reverse the trial court only if by no reasonable perception of common experience can it be concluded that the evidence tends to serve some purpose other than character conformity to make the existence of an elemental fact more probable or less probable than it would be without the evidence. *Montgomery,* 810 S.W.2d at 391. The issue must be considered in light of the legal standard announced in *Vernon,* not the *Boutwell* analysis employed by the trial court. *See, McGlothlin v. State,* 848 S.W.2d 139 (Tex.Crim.App.1993) (opinion on rehearing).

The state offered the extraneous conduct to show the prior relationship of the defendant and the victim. Each sexual act is a distinct offense, so the evidence of prior relationship is not "same transaction contextual evidence" which might be admissible out of necessity. *Rogers,* 853 S.W.2d at 33. Background contextual evidence is not admissible unless it makes an elemental fact more or less probable. The state did not suggest which elemental fact the extraneous conduct evidence tended to prove or disprove. The victim testified that appellant took the victim's hand, placed it on appellant's penis, grasped the victim's wrist and forced the victim's hand up and down until appellant ejaculated. Extraneous acts may be admitted to show specific intent. *Montgomery,* 810 S.W.2d at 394. The specific alleged conduct in this case, however, is not susceptible to an interpretation other than intent to arouse and gratify, so the evidence does not make that element more probable. Where the occurrence of the offense is the only fact in dispute, as is the case here, any theory of admissibility must stand or fall on whether it legitimately assisted the jury in determining that fact. *Owens,* 827 S.W.2d at 916. The state argues that appellant placed the victim's credibility at issue, but the Court of Criminal Appeals noted, in reviewing a case where the appellant's older daughter testified that she too was sexually assaulted by her father at age eleven, that general credibility of a witness in a criminal trial is not a material issue in the sense that it will justify the admission of inherently prejudicial evidence of details of an extraneous offense to bolster the victim's testimony. *Id.*

The state argues on appeal that appellant impeached the victim's credibility and opened the door to the extraneous offenses by cross-examining the investigating officer about her report of her initial interview with the victim. The state contends that the defense challenged the victim's credibility by cross-examining the victim about the date the offense occurred (ironically, whether the offense occurred on Good Friday, April 13, 1990) and by calling witnesses to testify that the victim was not at appellant's house on April 13, 1990, the date alleged in the indictment. The extraneous offense evidence was *not* offered in rebuttal, but on *initial direct examination* by the state. Appellant did not waive error by later eliciting this testimony. "[E]rror is not waived when the evidence is brought in later in an effort to meet, rebut, destroy, deny or explain the improperly admitted evidence." *Rogers,* 853 S.W.2d at 35. In the case cited by the state, *Pavlacka v. State,* 848 S.W.2d 325 (Tex.App.—Houston [1st Dist. 1993, pet. granted), the complainant was recalled to the stand *after* the defendant testified that the acts had not occurred and the defense had attempted to impeach the complainant with a prior inconsistent statement. The state's argument that appellant opened the door to specific instances of misconduct under Tex.R.Crim.Evid. 405(b) fails for the same reason. The evidence might well have been admissible once the defense cross-examined the victim, put witnesses on the stand to challenge the victim's presence at the scene on the alleged date of the offense, and paraded reputation witnesses to vouch for appellant's decent moral character. It is obvious from defense counsel's opening statement to the jury that the defense intended to attack the victim's credibility, but for some unfathomable reason the state elected to offer the extraneous conduct on direct without waiting for a valid excuse for its admission.

At the time the extraneous conduct was offered, the victim's credibility had not been impeached. Furthermore, the extraneous conduct does not rebut the challenge to his testimony because the testimony concerning the extraneous offenses was subject to the

same challenge as the testimony concerning the indicted offense and therefore could not logically rebut a challenge to the victim's credibility. *Jessup v. State,* 853 S.W.2d 141 (Tex.App.—Fort Worth 1993, pet. filed); *Hill v. State,* 852 S.W.2d 769 (Tex.App.—Fort Worth 1993, pet. refused). I conclude the state failed to offer the evidence for an admissible purpose under Rule 404(b).

In contrast to the state's assertion that appellant failed to lodge a Rule 403 objection, defense counsel did argue that the prejudicial effect must not outweigh the relevancy, and at the close of the hearing stated, "Of course, Your Honor, you know our same objection as to being inflammatory and prejudicial." *Flores v. State,* 840 S.W.2d 753 (Tex.App.— El Paso 1992, no pet.), held a virtually identical objection was sufficient to impose a duty upon the trial court to conduct a Rule 403 balancing test. Regardless, since the extraneous conduct was not shown to be relevant to a fact of consequence aside from criminal propensity, it was not admissible and no further analysis was necessary pursuant to TEX. R.CRIM.EVID. 403. The trial court erred in admitting the evidence of extraneous conduct. Appellant did not bring forward a statement of facts of the jury argument. Therefore, I cannot determine whether the state increased the harm by arguing the extraneous offenses to the jury. Nevertheless, this conduct was reprehensible in nature, of the same type as the charged conduct, and showed a long history of sexual abuse of the complainant. I cannot say that its admission had no effect upon the conviction of the accused. TEX.R.APP.P. 81(b)(2). Consequently, I would sustain point of error one and reverse for that reason alone.

I join the majority in their disposition of point of error two and their reversal.[1]

---

1. The majority does not address it, but the state argues and raises as a cross-point that the trial court erred in refusing to admit the entire report of officer Dolly Dill, the state's first witness on case-in-chief. The state contends that the entire statement, which mentions extraneous offenses, was admissible under the rule of optional completeness. TEX.R.CRIM.EVID. 107. This is not a matter which the state may appeal. TEX.CODE CRIM.PROC.ANN. art. 44.01 (Vernon Supp.1994). We should dismiss the state's cross-point for lack of jurisdiction. *See, State v. Manning,* 833 S.W.2d 322 (Tex.App.—Waco 1992. no pet.).